Second and final case, this morning, is number 24, 1876, Rudge Electronic Co. Ltd. v. Autel Intelligent Technology Corp. Okay, Mr. Rubina. Good morning. May it please the Court, I'm John Rubina on behalf of Pellant Orange Electronic Company. For every issue on appeal, there is substantial evidence to support the jury's verdict. I'd like to start with the sales issue where Autel ITC sells products into the United States. The substantial evidence to support that verdict, that part of the verdict, includes the sales contracts, the actual sales contracts, which were, for example, Appendix 9054. Their title and sales contract, they identify the seller as Autel ITC in China, the buyer as Autel US in New York. It shows the shipping address to be New York. It shows quantities, prices, and it shows the port of destination to be the United States of America. The other documents that support that, as well, with the same information. Counsel, do you agree that Autel US sells the accused products in the U.S.? Is that? They sell them once they buy them from Autel ITC. But first, Autel ITC sells them to Autel US as the customer. Why did you choose not to sue Autel US? We had a strong case of direct infringement, we believed, against Autel ITC, the manufacturer who had evidence of how the products worked. Was there somebody, I think the other side makes a suggestion, or maybe even more than a suggestion, that it was to keep the case in this forum and not be transferred to maybe California? Your Honor, there were... Right, if there's only a foreign... Or transferred to New York. Right. To New York? New York. To New York. There were strategic decisions made early on for various reasons, but we felt that there was a clear case of direct infringement against the manufacturer, and that was the most streamlined way to approach it. Do you agree that production and distribution occur in China? Production and distribution occur in China? Yes. Production occurs in China. I'm not exactly sure what the Court refers to as distribution, but they sell it from China to the United States directly. The invoices, the packing lists that are cited in our briefs, all have the same information that the products, volumes, and prices are being sent and shipped directly to the buyer. They identify Autel U.S. as the buyer in New York. The district court was incorrect when it said that the distribution agreement was the final contract of all essential terms, because that agreement has no prices and it has no volumes, and it expressly says that final prices will be agreed upon later. So that distribution agreement is not the sales contract. The sales contract is what we cited to in our brief that are called sales contracts, Appendix 9054. And remind me, is there evidence as to where the sales contracts, what was the location of the act that made the sales contract a contract? So what the witness, the Autel witness said was that the Autel U.S. would send its request, volume request, to Autel ITC. So that's done from New York to China. And then Autel in China would approve the request, do the paperwork, and send the products to New York. So doesn't that scenario, I think maybe as with the distribution agreement, make the act that created the contract an act that occurred in China, in Shenzhen? No, Your Honor. The buyer is in the United States. Right. This is similar to the light tubes and the SEP cases. I'm sorry. I was just focusing on the location of the act that completed the contract. Not its performance, but completed the process of making the agreement into a binding one. And that would have been when Autel ITC said, yes, I will fulfill your order. And that act occurred in China. I'm just trying to get all that. Autel ITC agreed to the contract while Autel ITC was in China. Yeah, okay. That part's correct. The witness, Ms. Chen, also confirmed that she does the packing of all the goods and ships them. Her department is responsible to ship it to New York. And when I asked her to confirm that her department ships to New York, to Autel U.S., she gave a strange answer and said, I said, your group is responsible for shipping these products to Autel U.S., isn't it? And she said, yes, but these are two different concepts, shipping to Autel U.S. versus shipping to the United States as a destination. So the only explanation she gave for that strange answer is that the title transfers while it's in China, the title of the product. That's a repackaged FOB argument, which this Court has said repeatedly, at least in the Seb case and the Lightcubes case, that just stamping your sales documents FOB foreign country does not escape liability for direct infringement. And that's all they've done. Did Autel U.S. take delivery at ports in China? No, Your Honor. They argued that in their briefs, but they did not. There's no evidence that Autel U.S. came to China and got the products and brought them back. The evidence is they didn't go to China. I'm sorry. They didn't go to China. They didn't go to China to get the products and bring them back. The evidence is that Autel ITC shipped the products directly to New York. And the argument that they make that they received them in China is only based on the transfer of title, the FOB argument. The products were shipped directly to New York. That's what the evidence is. Finally, the case law comparison. The district court seemed to suggest that maybe HALO changed the law of Lightcubes and the Seb case because it said that those cases have to be read in light of the later HALO case. But I submit it did not change the law. The facts were very different in the HALO case. In HALO, the manufacturer, Pulse, that was the defendant, they sold the products to Asian contract manufacturers. They had contracts with the contract manufacturers. That intermediate company assembled those products into larger products and sold them to Cisco in the United States. So the HALO decision is distinguishable easily based on that intermediate company, who was the actual sales contract between the defendant in Asia and the contract, the buyer, who was also in Asia. In fact, the little map that was submitted in our opening brief shows that all of the cases that Autel and the lower court relied on that found no direct infringement sales had an intermediate company located outside the U.S. who was the actual buyer. And this case is exactly like the Lightcubes case and the Seb case where the sales were direct from a foreign seller to a U.S. buyer and the shipments were right into the U.S. buyer. And that's what we have here. I'd like to move on, unless the Court has questions on that issue, to the next issue on appeal, which is Autel's other non-infringement argument. I don't think that's part of your appeal, so you have to do that on rebuttal. Yes, Your Honor. I take it then the obviousness issues are also for discussion. Yeah, yeah. Thank you. Ms. Sarkarosky. Good morning. I'm Nicole Sarkarosky for Autel. Just speaking about this first issue, there's just no evidence with respect to Autel taking these sales, offering to sell, or importation activity in the United States. They chose to sue Autel, not Autel U.S., and to sue for direct infringement as opposed to some indirect infringement theory. So I'd just like to respond to some of the questions with citations to the record about specifically where these things happen. We'll look, as the HALO case suggests, at both contract formation and then delivery and performance. Contract formation, there's the distribution agreement, which was only effective when signed by Autel in China, and that's on page 7256 of the joint appendix. And then I think, as counsel acknowledged, the sales contracts are only accepted, they only become contracts when accepted by Autel in China, and that's on page 7246. On the second question about delivery and performance, it is crystal clear in the record that although Autel packages for shipping, that Autel U.S. is actually responsible for the shipping to the United States, that there is that Autel U.S. accepts the deliveries, imports in China, that's on page 3039 of the record, and Liz Chen, who testified about this, explained that the responsibility for bringing the products into the United States is on, that's on page, is Autel U.S., that's on page 3059 and 7248 of the record. So words like accept and responsible are some distance from a description of physical concrete acts. What does Autel U.S. do that constitutes accepting these goods in China or constitutes being responsible for the next leg, which is putting it on the boat to New York? Right. It arranges all of the shipping into the United States. That's Ms. Chen's testimony on page 3059. So it here being what? I'm sorry. Autel U.S. arranges for the shipping into the United States. It takes title at these ports in China, and all of the arranging for shipping into the United States is by Autel U.S. And just, I mean, at the level of human beings, who is that and where is that person who's making the arrangements with the carrier between Hong Kong and? Well, Autel U.S. is a company that's located in New York, and so they're making the arrangements to have the items come from China to New York. They're making the arrangements from their, I assume their headquarters in New York. I don't know that the record says anything about that. But they're bringing it from China to New York. And so if we look at the activities of Autel, they are all in China. It is all contract formation in China. It is manufacturing in China, providing these products in China to Autel U.S. who takes title to them there and arranges the shipping into the U.S. And the district court, I think, looked at this very carefully, assessing this Court's precedence. I think the other orange has suggested that, you know, the district court just said, well, they take title in China and that's it. And that's just not a fair assessment, I think, of what the district court said. I think the court said. No, I agree with that. So there are certain cases like you that say FOB foreign country is not by itself enough. So you say we have more. Right. And the question is, at what point does the more become, as a matter of law, it changes the conclusion so that you reverse a contrary jury verdict? Right. So I think the more is that all of the activities that the Court has defined as relevant for sales, offer to sell, or importation, which are the contract formation activities and the delivery and performance activities, all of those activities were Autel U.S.'s activities in the U.S. Like, there's just no evidence in the record saying that Autel in China did any of those activities. And if we look at, you know, the completion of the contract. So putting aside the formation of the contract and just on the delivery and the acceptance and delivery and arranging for transportation, you don't think it matters that those are activities that don't seem to have much physical, concrete reality to them? Well, there's two sources. Unlike Pulse, right? Pulse was actually, you know, had a second factory in whatever the country was, Korea or someplace, and was taking these parts and putting them into larger computers or something. And this is, I don't know, like a paper activity or something? All of which is done from New York. I don't think that's a fair assessment of the record. I think the record has two sources of evidence that speak to this. There's the distribution agreement, which says, like, how it's supposed to work, who's responsible for what. And then there's Ms. Chen's testimony about how it actually works, like who does what. And I'll just say the only evidence that was put on this point was Otel's evidence, Ms. Chen, the distribution agreements, the sales agreements. I think Orange took that evidence from a given. As a given, they just say that it doesn't or that it is enough to amount to, you know, the necessary connection to the United States. But, you know, you look at the distribution agreement, the pages that I cite, and they say here's where the responsibility lies, here is that Otel U.S. is responsible for shipping into the United States, and it provides detail on what that means, not just taking title but, like, steps. And then the details that go beyond what would otherwise be inherent in FOB, Chen Chen. Yes. In terms of the steps that Otel U.S. takes for shipping. But then you have Ms. Chen's testimony, and she actually walks through this in detail, how this works in reality. So it's not – this isn't like just a paper, who's responsible for bringing it into the U.S. I mean, the activity to bring it into the United States and sell in the United States is Otel U.S. And I think it's important under the statute, because the statute isn't like a do you intend to sell in the U.S., do you think your products will end up in the U.S.? It is the activities have to be in the U.S. because of the presumption against extraterritorial application. And so I just think if you look at the record evidence here, Orange's argument amounts to an argument that, well, Otel knew the products were going to the U.S., and it was selling to a U.S. customer, but it was not selling those products, shipping those products directly into the U.S. And the testimony that counsel cited about Ms. Chen, she said, yes, we're selling to a U.S. company, but we are not the ones shipping to New York. We are not the ones shipping to the United States. And so we think the district court reviewed this very carefully and just had it exactly right here. I might address some of the other issues, because there are several. With respect to eligibility, I mean, this is really a paradigmatic case to us of a patent that's directed to an abstract idea, and that's what the district court said. It's about updating the sensor identification in the context of tire pressure monitoring sensors. And this patent, I think, tries to dress it up by going through, you know, the generic steps of reading and writing and transmitting information to say, you know, that it's doing something more than the idea. But it just amounts to this idea that it's going to clone the sensor ID from the old sensor and use it in the new sensor. Can you see what It seemed to set the district court's analysis on step one, at least what I saw on the record, was pretty terse. Can you tell me what the district court said with respect to step one of that? Right. So this is – I think this is on page – there was a summary judgment hearing. The district court discussed it at the hearing, and then I think summarized on page 42 of the appendix that it's directed to the abstract idea of updating the sensor ID in the context of a tire pressure monitoring sensor. I think the court had – I don't know that there was a lot more analysis of that in writing, but I think that that was – the court said it accepted Otell's arguments on that point, which were essentially that it was just this idea and a whole bunch of generic kind of black box components to do the idea. If you look, for example, on figure one of the patent, you know, it basically just has these, like, generic boxes of processing, transmitting, sensing, et cetera, but, you know, really nothing more than that in terms of what this patent is doing. And if you look at those, you know, elements, even Orange's expert testified that all of those elements are in the toolbox of a person skilled in the art. You know, these elements of kind of sensing, transmitting, et cetera. And this Court has had a number of cases where it's explained, you know, that – I'm sorry. I thought I said 52, or at least I meant to say 52. But that's where – Mr. Court. It's right at the top. Otell previously argued in the court – I was thinking 52. Yeah. Okay. Yeah. I apologize if I misspoke there. But, you know, this is just this – the idea is let's clone the sensor. The question is is there something more to this, you know, something at Alice Step 2 that would give it an inventive concept? Even Orange's expert said, well, the particular elements were all known. That's McAlexander's testimony at pages 31, 57 to 61. And so then Step 2 came down to a question about whether the combination – there was an ordered combination that was inventive. And there was, I think, McAlexander, Orange's testimony saying, yes, you know, I think that this is inventive. The difficulty with that is that that testimony was entirely conclusory. There wasn't any explanation of, you know, what made this anything out of the ordinary, what made it anything other than well-understood conventional routine. And that kind of conclusory testimony, this Court has said in cases like CX Loyalty, in the MOVE case, you know, an expert can't just come in and say, like, I think it's an inventive concept. Otherwise, you could always manufacture a factual dispute at Alice Step 2. Could you talk about the obviousness issue, please? Sure. So the claimed invention here is the cloning of the old ID, which is disclosed in the Nance patent. And essentially everything else in these claims is disclosed in the Nihei patent. The Nihei patent basically discloses a system of transmitting information from a sensor wirelessly. And so our expert went through, and we have ample chart in the brief that explains how each limitation was disclosed in one of these references. The district court basically concluded that there was one thing that this – these claims do that wasn't in the Nance and Nihei references, but that's – we don't think that that's supported. And that was the limitation of a portable setting apparatus. What about the other grounds that the other side argued, not the two that the district court relied on, which were both about portability and teaching? Right. The other grounds, which seem to me to be weightier than the ones the district court relied on. Okay. Right. So the district court relied on portability. We addressed it in our brief. I think there are essentially three other arguments that Orange is making in the brief. One is that the invention – the claimed invention is bypassing the controller in the vehicle, the computer in the vehicle, and that that makes it something in addition to what Nance and Nihei disclosed. I think the problem with that, as our reply brief explains, is that the claims as written don't require bypassing the controller. They just set out steps of transmitting the information from the old sensor to the setting device to the new sensor. But bypassing the controller just isn't a required aspect of either Claim 26 or 27. The second argument that they make in the briefs is a – I think a teaching – trying to be a teaching away argument about low-frequency transmission versus high-frequency transmission. The argument is, well, Nance discloses a low-frequency transmission and we use a high-frequency – they use a high-frequency transmission. And I think there's two problems with that. One is that Nance doesn't teach away. It just gives an alternative of low-frequency as opposed to high-frequency. And second, Nihei, the other citation, actually does say high-frequency, so that gives the high-frequency limitation. And then I think the third argument that they make is that the Nance reference uses a bank of IDs and that they use only one identification. That's the identification to send to the computer to identify the sensing device. The difficulty with that, as we explain in our reply brief, is that that paragraph of Nance actually gives two alternatives. One is to use the bank of IDs and the other is to use just one ID to send to the computer. So I know I went through that relatively quickly, but I think each of the three arguments they make in addition to the portable argument is addressed with citations in our reply brief. The only other thing that I just wanted to discuss very briefly is the alternative non-infringement argument. And, by the way, you do want us to rule on validity even if we agree with the district court on non-infringement? Yes. That's how we interpret this Court's cases, interpreting the cardinal chemical decision from the U.S. Supreme Court. Right, but it's up to you. Okay. Well, we, yes, we did raise the invalidity issue in the cover claim, and so. You did not say in your brief that this was conditional. Right. Yes. Thank you. And just the last. As a follow-up to Judge Taranto's question, if we reach invalidity and if we were to reach the conclusion in your favor, we can rule on either Section 101 or 103? I think that's correct, yes. Also, just to address this last non-infringement issue, just to have a quick minute on it, the key limitation, there's a key limitation that is in these claims, that the old tire pressure sensor stores only the old identification. That had to be put in there, I think, to overcome the Nance reference, which refers to a bank of identifications as opposed to only one identification. The problem is that the OTEL sensors store three identifications, not one identification. So, I mean, this is a literal infringement claim. Literally how we interpret it matters. There was a claim construction that identifies, that describes, I'm sorry, that defines identification very broadly as any number or code used to identify, and all three of these in the OTEL sensors are numbers and codes used to identify. Okay. Thank you. You're out of time. I'll give you two minutes. Thank you. Mr. Rubino. Your Honor, I'd like to start with the sensor ID, the last issue that counsel was addressing first. The substantial evidence that supports that verdict, that part of the verdict is shown, part of it is on page 13 of our response brief, which is an excerpt, is an image of OTEL's manual, which shows they only have one sensor ID. The old sensors that they're copying from only have one sensor ID. That's from Appendix 7202. The jury was entitled to rely on that. The counsel's argument that they have a serial number and a chip ID, those are not sensor IDs, and the claim says you can only have one sensor ID. It uses the word detector, but they're synonymous, detector and sensor. The claim says that, for example, when it's talking about the old ID, it says Am I remembering right that this is because the other two items that were pointed to are never sent to the computer for use as an ID? That's correct. They're never to be written. The claim says it should be to be written. The claim says, both claims say, call the old identification of the old prior pressure detector. It's the identification of the detector. The claim doesn't care about the identification of some chip inside or the part serial number. It's not saying you can't have any of that stuff. In fact, their experts said you can have other information because that would be meaning that would render it meaningless. The claim, in order to distinguish over the Nance reference that had multiple sensor IDs stored and the technician would select one of those and then report back to the car, this is the one I selected. The claim is saying you can't do that because then you have to communicate with the car, and that's the goal of this invention was to not communicate with the car. So they limited it to you only have one sensor ID, and that's what the claim says. So the jury was entitled to rely at least on that, and there was no dispute that Autel has only one sensor ID in their old systems. And that argument also only applies to the scenario when Autel's branded sensors are being replaced as the old one. If there's OEM sensors in the car or other brands, there's no dispute, and Autel didn't raise that aspect in their appeal. And there is evidence in the record that OEMs only stored one sensor ID as well. I would like to turn now to obviousness. There are a number of reasons. There's substantial evidence. Mr. McAlexander's testimony was not conclusory. What he said was that the entire industry was moving, was focused on how do you work with the car? How do you work with the car's controller? You need the OEM protocol. Well, I don't care so much about what the entire industry was doing. I care what the claim says. Yes, Your Honor. But the prior art that was submitted, the NIEHE and NANCE references, both of those required communication with the vehicle's controller, which is one of the reasons why he said it wasn't obvious to do this. They weren't focused on getting away from the communication protocol issues. Some of the distinctions that ---- What's the claim language? What's the claim language you're talking about, you're relying on? The claim language allows for you to not have to communicate with the car. It's not an express recitation that you don't have to communicate with the car. It provides for that ability to not communicate with the car because it's all self-contained. There's no claim language? No, Your Honor. Okay. But it was a reason why it wasn't obvious to combine this to do what the claimed invention is saying. That's what Mr. McAlexander testified to. The portability, neither reference showed a portable setting apparatus. NANCE, that system is entirely self-contained in the car. That was the immobilizer. That's part of the car's controller. It's a circuit in the car's controller. So he has no motivation to make a portable device. The NEHE is what they rely on, has a setting device 60, which NEHE says you can carry that to the vehicle. So that setting device by itself is portable, but NEHE is ---- But their testimony was that the setting apparatus, which I think is the claim language, consists of a combination, to simplify, of NEHE's setting device plus NEHE's laptop. PC. PC, but it includes a laptop. It says PC, and it's tethered to the setting device. And what Mr. McAlexander says is that in this context, Warner Steeling Art would not consider that configuration to be portable. But it's portable with respect to the vehicle. It's not portable in the abstract. Not in the abstract, Your Honor. Portable in the context of what is this invention. It's a tool for a tire technician. Do you agree with Judge Dyke's point that it's portable with respect to the vehicle? No. No, Your Honor. No. No? Doesn't the claim language say that expressly? The claim says portable with respect to the vehicle. That's correct. But you have to also look at the rest of the claim. It's a TPMS system, an architecture with sensors and a portable apparatus. So the technician is carrying, to do the programming, he takes the setting apparatus. It doesn't have to be handheld, right? I'm imagining the garage that rotates tires or does something like that. And it's on a little cart. It moves around to the different bays. To do the programming there, Your Honor, you need to hold the sensor, the new sensor, and the old sensor, and you need to go to the wheel. And so under Autel's theory, that technician also has to get the PC. And he's not a juggler. He's a mechanic. Well, that's why I referred to a cart. Right. But Mr. McAlexander said that that would not be considered a portable setting apparatus. So all of this comes down to this idea that, to put it, I guess, in the right terms maybe, that a jury could conclude that it was actually unreasonable to consider the PC as part of the setting apparatus. That's correct, Your Honor. And that's what the reference said. It's not part of it. And Mr. McAlexander kind of says that at one point, almost in passing, but not very expansively. I believe he said that the PC is not part of the setting apparatus because he said element 60 is the setting apparatus. I don't have a cell for you, Your Honor. I see I'm out of time. Okay. Anything else? All right. Could I address the communications channel just very briefly? Take a minute. Okay. Yes, Your Honor. On the communications channel, Dr. Suri, who said he was combining these two teachings, he said a number of different things about why he would combine. In particular, he never explained why he would take one, the LF channel from one teaching and the RF channel from the other teaching. In fact, he said the opposite. He said in explaining why he would combine, he said, doing that using the radio frequency disclosures and teachings of the NANDs, a person of early skill would take advantage of those multiple frequency communication channels to implement essentially what the 064 is teaching. That was what he said about why he would combine them. He never addressed why you would pick one channel, which the claims require two different channels. He never addressed why you pick one from one reference and the other from the other reference. Okay. That was on November 29, 49. Thank you, Your Honor. Ms. Saharsky. Just very briefly, if I could start by addressing obviousness. First of all, the only evidence on motivation to combine was from our expert, Dr. Sori, who said that a person would be motivated to combine. That's page 2862 in the record. And there wasn't contrary evidence about motivation to combine these two references. In terms of what the portable setting apparatus was and what a jury could conclude, their expert, Mr. McAlexander, himself testified, and he admitted this on cross-examination, that you would consider the personal computer and the setting device together as the setting apparatus. That's 3166 to 3167 of the record. He says you consider it together. He says a PC can be a laptop on 3166, and he said that it can move independently from the vehicle on 3167 to 68. So that is portable relative to the vehicle, and that's exactly how the claim defines it. I think the – and if you look at whether the patent, this is Nance – I'm sorry, NEHI discloses something that moves around the vehicle. Paragraph 72, which is on page 3756 of the Joint Appendix, talks about the setting device being moved near the wheel installation position, moved near the vehicle in the same way that we're talking about. The only other argument I think that's being made is this one about the radio frequency and Nance. Now, let me again say that – this seems to me really quite important. So 3166, 3167. Where exactly does McAlexander say that for purposes of analyzing what constitutes the setting apparatus, it is proper to consider the two things, setting device and PC together? Is this just this – from line 22 down to the bottom of 3166 up to the top, which I can't tell what exactly it's talking about? I'm just looking at – on page 3166, he says that PCs include laptops. Right. He talks about – and then as it goes from 66 to 67, he talks about the combination being involved as the setting device. And I think that it – he continues to explain it, but I think it's him saying  Where does he say that the – is this – so in the question is, now the components on the right-hand side of figure 4, that's knee-high? Is that right, figure 4? And to be clear, I'm talking about setting device 60 and PC62.  Those are the components that are involved in inputting an ID and later transmitting that ID to the transmitters that are shown on the left side of the figure. Is that right, sir? The combination is involved. Question. The combination is involved. Right, sir? Correct. I don't quite see how you get from there to saying McAlexander agreed that the setting apparatus consisted of the combination. Okay. So in context, this is a discussion of, like, what is doing – what is the setting apparatus and what is doing the manual input of an ID and serving as the function of the setting apparatus. And the setting device is number 60. The PC is number 62. And at this point, you know, after a significant lead-up, there's a discussion, and then McAlexander says it is the combination that is doing this function. The combination is involved, I think, in the context of this and in the context of the Neha patent, and in particular paragraph 63 and 72 of the Neha patent. The combination is involved means that those two things are the setting apparatus. And that, I think, was the argument that was made to the jury. And that, I think, is the problem, that McAlexander isn't making an argument about them being independent. Because what the district court cited to is that 3154 and 3155, where McAlexander kind of says the opposite. Right. But I think that was a differing point and one that isn't consistent with the claim language. McAlexander says there it's not portable because it's tethered to a PC. That means that it's not portable. But the problem is that he later said, well, a PC can be a laptop and this can move independently and I can consider them together and they're going to move independently with the PC being a laptop. That's a number of pages, but all around 3166 to 68 and also 3154. And so I think the difficulty is that McAlexander, to the extent he's suggesting it's not portable because it's not handheld or something like that, that's not what the patent says. It says, you know, portable relative to the vehicle. And so that, I think, is the problem. If I could just say one thing about Section 101, which is this. I mean, this. I think we're out of time. Okay. Thank you very much, Your Honor. Thank you. Thank you both. Thanks for submitting.